**Michigan Supreme Court**
**Lansing, Michigan**

# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

MSSC, INC v AIRBOSS FLEXIBLE PRODUCTS CO

Docket No. 163523. Argued December 7, 2022 (Calendar No. 2). Decided July 11, 2023.

MSSC, Inc., brought an action in the Oakland Circuit Court against Airboss Flexible Products Co., alleging anticipatory breach of contract and seeking to enforce a purchase order between the parties after Airboss threatened to stop filling orders unless MSSC agreed to a price increase. Airboss supplied products to MSSC, and MSSC used those products to manufacture parts for their customers. The parties' purchase order for the Airboss products was identified as a "blanket" order that listed the parts to be supplied but did not include specific quantities. Instead, the purchase order indicated that quantities would be based on the needs of an MSSC customer. MSSC was obligated to create and send "releases" per the terms and conditions, but neither the purchase order nor the terms and conditions obligated MSSC to send any number of firm orders to Airboss—either as a raw number or as a percentage of MSSC's total need.

MSSC brought the instant suit, and the trial court granted a preliminary injunction in favor of MSSC, finding that the contract was a requirements contract and was likely enforceable. Airboss moved for summary disposition, arguing that the purchase order failed to satisfy MCL 440.2201(1), the statute of frauds of the Uniform Commercial Code, MCL 440.1101 *et seq*. In response, MSSC moved for summary disposition, arguing that the blanket purchase order was a requirements contract that satisfied the statute of frauds. The trial court, James M. Alexander, J., granted MSSC's motion for summary disposition, concluding that because the purchase order was identified as a "blanket" order, it contained a "quantity term" that satisfied the statute of frauds. Airboss appealed, and the Court of Appeals, GADOLA, P.J., and JANSEN and O'BRIEN, JJ., affirmed. 338 Mich App 187 (2021). Airboss sought leave to appeal in the Supreme Court, and the Supreme Court granted the application. 508 Mich 1024 (2022).

In an opinion by Justice WELCH, joined by Chief Justice CLEMENT and Justices BERNSTEIN and CAVANAGH, the Supreme Court *held*:

The term "blanket" order, without more, does not express a quantity term that satisfies MCL 440.2201(1), the statute of frauds of the Uniform Commercial Code, MCL 440.1101 *et seq*. The Court overruled *Great Northern Packaging, Inc v Gen Tire & Rubber Co*, 154 Mich App 777 (1986), to the extent that it held to the contrary.

1.  MCL 440.2201(1) provides that contracts entered into for the sale of goods worth $1,000 or more must be in writing and that a court may only enforce the contract up to the quantity of goods set forth in writing.  When a contract fails to include a quantity term, parol evidence—evidence outside the contract itself—cannot be offered to supply a missing quantity term.  A requirements contract is a contract in which a buyer promises to buy, and a seller to supply, a set amount or percentage of the goods or services that a buyer needs during a specified period, such as "all requirements of the buyer."  Requirements contracts may be created by a "blanket" purchase order, which, along with the amount or percentage to be purchased and supplied, sets forth the terms governing items such as price, length of contract, warranty, details, indemnification, and termination.  However, a quantity term is what is needed to specifically create a requirements contract.  MCL 440.2306 provides, in pertinent part, that a term that measures the quantity by the requirements of the buyer means such actual requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate may be tendered or demanded.  In contrast, release-by-release contracts are governed by a blanket purchase order that sets the overall contract terms, and the buyer issues subsequent releases that set forth the specific quantity the buyer needs; however, unlike a requirements contract, the blanket purchase order does not set forth the share of the buyer's need to be purchased from the supplier.  Although the seller is not bound to accept future orders in the same manner as with a requirements contract, the seller is bound by the terms in the purchase order when future releases are issued and accepted.  The key difference between a requirements contract and a release-by-release contract is the level of mutual obligation between the parties and the risk each party bears.  A requirements contract assures the seller that the buyer will be a customer for the length of the contract, but the seller cannot reject future orders for the length of the contract.  In contrast, a release-by-release contract gives both parties the freedom to allow their contractual obligations to expire in short order by either not issuing or not accepting a new release.

2.  In this case, the documents between the parties created a release-by-release contract, not a requirements contract.  The documents did not contain a quantity term; rather, the purchase order only stated that MSSC would issue releases.  While the releases contained a firm quantity and MSSC's estimated future need, those releases only constituted an obligation binding Airboss as to each individual release if Airboss accepted—not a promise to fulfill all future releases.  The trial court in this case erroneously relied on *Cadillac Rubber & Plastics, Inc v Tubular Metal Sys, LLC*, 331 Mich App 416 (2020), to hold that the use of a blanket purchase order combined with a substantial history of prior dealings between the parties created a requirements contract that bound Airboss.  The trial court's reliance on *Cadillac Rubber* was erroneous because in *Cadillac Rubber*, the Court of Appeals had found that a quantity term existed—"a quantity between one part and 100%"—which therefore allowed it to use parol evidence to discern the parties' intent.  In this case, however, there was no quantity term; accordingly, parol evidence could not be used to determine the existence of a quantity term.  The parties instead entered into a release-by-release contract.  The purchase order and incorporated terms and conditions in this case created a blanket agreement, while the releases created individual purchasing contracts governed by the umbrella terms.  This saved the parties from renegotiating complex terms for each order while allowing the parties greater flexibility than a requirements contract would allow.  Either party was able to walk away from the agreement once a release was fulfilled, and Airboss's choice to do so was not legally actionable.

3.    The contractual requirement of "good faith and fair dealing" did not create a requirements contract.  Every contract has an implied duty of good faith and fair dealing.  But the quantity term must be explicit under MCL 440.2201(1), and an implied duty is very different from an explicit written requirement.  Good faith alone cannot solve the problem of the missing quantity term.

4.  A 2015 communication between the parties that stated that Airboss was "awarded the . . . value add of MSSC for the life of the . . . program in exchange for continuous improvement and year over year productivity" did not create a requirements contract.  In context, "value add" was more appropriately read as a statement of pricing—and Airboss sharing in profitability of the parts it makes—not actual sourcing.  An award of the "value add" in exchange for "continuous improvement and year over year productivity" showed an expectation of decreasing costs-per-unit leading to greater reward to Airboss.  This communication was more appropriately read as a per-unit dollar figure shared with Airboss, not an obligation for MSSC to purchase parts from Airboss.

Reversed and remanded to the Court of Appeals for further proceedings.

Justice VIVIANO, joined by Justice ZAHRA, concurring in part and dissenting in part, agreed with the majority that the term "blanket" order, without more, did not express a quantity term and that *Great Northern* should be overruled to the extent that it held to the contrary.  Justice VIVIANO also agreed that neither the provision in the purchase order stating that MSSC "shall issue" releases to Airboss nor the UCC's imposition of "an obligation of good faith" created a requirements contract such that the statute of frauds was satisfied.  However, the lower courts did not address the May 2015 update to the purchase order, and it was unclear to Justice VIVIANO whether this provision obligated MSSC to purchase a quantity of parts from Airboss such that the statute of frauds was satisfied.  Accordingly, rather than hold that the parties did not enter into a requirements contract, Justice VIVIANO would have remanded this case to the trial court for it to resolve this issue.

Justice BOLDEN did not participate in the disposition of this case because the Court considered it before she assumed office.

# OPINION

Chief Justice:　　　　　Justices:
Elizabeth T. Clement　　Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra Harris Bolden

FILED July 11, 2023

S T A T E   O F   M I C H I G A N

SUPREME COURT

MSSC, INC.,

　　　　　Plaintiff/Counterdefendant-
　　　　　Appellee,

v　　　　　　　　　　　　　　　　　　No. 163523

AIRBOSS FLEXIBLE PRODUCTS CO.,

　　　　　Defendant/Counterplaintiff-
　　　　　Appellant.

BEFORE THE ENTIRE BENCH (except BOLDEN, J.)

WELCH, J.

This case involves a dispute between automotive suppliers. MSSC, Inc., sued Airboss Flexible Products Co. because Airboss refused to continue providing parts at a price set forth in a blanket purchase order. The resolution of this dispute depends on the type of contract the parties created. The trial court granted MSSC's motion for summary disposition, finding that the parties created a requirements contract, thus binding Airboss

to continue selling parts to MSSC.  The Court of Appeals affirmed, and Airboss appealed

the result to this Court.  Contrary to the lower courts, we find that the parties entered into

a release-by-release contract, which allowed Airboss to stop selling parts to MSSC.  We

therefore reverse and remand for further proceedings that are consistent with this opinion.

## I.  BACKGROUND

### A.  THE UCC'S STATUTE OF FRAUDS

To understand the facts in this case, it is first helpful to provide some legal

background regarding supplier contracts.  Under Michigan law, contracts for the sale of

goods—including supplier contracts—are governed by the Uniform Commercial Code (the

UCC), MCL 440.1101 *et seq*.  The UCC contains a statute-of-frauds provision that governs

which agreements must be in writing.  MCL 440.2201(1).  That section provides:

> Except as otherwise provided in this section, *a contract for the sale of goods for the price of $1,000.00 or more is not enforceable by way of action or defense unless there is a writing sufficient to indicate that a contract for sale has been made* between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker.  A writing is not insufficient because it omits or incorrectly states a term agreed upon but *the contract is not enforceable under this subsection beyond the quantity of goods shown in the writing.*  [*Id*. (emphasis added).]

The first sentence of MCL 440.2201(1) mandates that contracts entered into for the sale of

goods worth $1,000 or more must be in writing.  The second sentence of MCL 440.2201(1)

allows for some terms to be missing or incorrect but provides that a court can only enforce

the contract up to the quantity set forth in writing.  In other words, quantity is the only

*essential* term required by the statute of frauds.  See *In re Frost Estate*, 130 Mich App 556,

559; 344 NW2d 331 (1983).  If an agreement for the sale of goods contains a quantity, then

2

the agreement satisfies the statute of frauds.  See *Lorenz Supply Co v American Standard, Inc*, 419 Mich 610, 614; 358 NW2d 845 (1984).

Thus, in reviewing an agreement involving the sale of goods for more than $1,000, a court must endeavor to identify the "quantity term" in the contract to determine whether the contract is enforceable.  When a contract fails to include a quantity term, parol evidence—that is, evidence outside the contract itself—"[cannot] be offered to supply a missing quantity term."  *In re Frost Estate*, 130 Mich App at 559.  In contrast, when a contract provides a quantity term but fails to express details sufficient to determine the specific or total quantity, "it may be explained or supplemented by parol evidence."  *Id*. at 560, citing MCL 440.2202 (the UCC's parol evidence provision).

## B.  TYPES OF QUANTITY TERMS IN SUPPLIER CONTRACTS

The UCC allows for a contract's quantity to be measured "by the output of the seller or the requirements of the buyer . . . ."  MCL 440.2306(1).[1]  This provision allows for parties to enter into contracts that provide a quantity term but lack specificity as to the total of goods agreed upon.  Two types of contracts fall under this provision: output contracts and requirements contracts.  Both are commonly used between suppliers.  Today we formally recognize a third type of contract: a release-by-release contract.

An "output contract" defines quantity by the supply provided by the seller.  See *Black's Law Dictionary* (11th ed), p 408 (defining "output contract" as "[a] contract in

---

[1] "A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded."  MCL 440.2306(1).

which a seller promises to supply and a buyer to buy all the goods or services that a seller produces during a specified period and at a set price"). In contrast, a "requirements contract" is a contract that defines quantity by reference to the buyer's requirements. See *id*. at 410 (defining "requirements contract" as "[a] contract in which a buyer promises to buy, and a seller to supply, all the goods or services that a buyer needs during a specified period"); see also *Acemco, Inc v Olympic Steel Lafayette, Inc*, unpublished per curiam opinion of the Court of Appeals, issued October 27, 2005 (Docket No. 256638), p 9 (defining a typical requirements contract as "an agreement 'in which the seller promises to supply all the specific goods or services which the buyer may need during a certain period at an agreed price in exchange for the promise of the buyer to obtain his required goods or services . . . from the seller' ") (citation omitted).

In agreements between a buyer and supplier-seller, requirements contracts are often created by an umbrella agreement, which is also referred to as a "blanket purchase order." This umbrella agreement sets forth the terms governing items such as price, length of the contract, warranty details, indemnification, and termination. See *David Engineering Co, LLC v Morbern Inc*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued July 31, 2012 (Case No. 11-12615), pp 2-3 (describing a Tier-1 supplier's supply agreement which "set[] forth the terms and conditions for all purchase orders of a particular part or program during the life of the [agreement]" and against which the buyer issued four purchase orders); see also 77A CJS (February 2023 update), Sales, § 41 ("A blanket purchase order does not oblige the seller to manufacture or ship; that obligation arises when the buyer issues a shipment, production, or release order against the blanket purchase order."). Most importantly, in a requirements contract, the terms of the

4

blanket purchase order also dictate that the buyer will obtain a set share of its total need from the seller (such as "all requirements of the buyer"). This phrase satisfies the quantity term required by the statute of frauds. MCL 440.2306(1). To supplement this general term, the buyer will typically later issue "releases" to let the seller know its specific short-term requirements.

Finally, similar to requirements contracts, some agreements are governed by a blanket purchase order that sets the overall contract terms, and the buyer issues subsequent releases that set forth the specific quantity the buyer needs. But unlike a requirements contract, the blanket purchase order does not set forth the share of the buyer's need to be purchased from the supplier. See *Advanced Plastics Corp v White Consol Indus, Inc*, unpublished opinion of the United States Court of Appeals for the Sixth Circuit, issued January 18, 1995 (Case No. 93-2155), p 2; 47 F3d 1167 (Table) (finding that the parties' "Blanket Purchase Order Terms and Conditions" did not create a requirements contract because there was no quantity term and "the parties intended for [the buyer] to purchase quantities of parts only according to its releases, and not according to its requirements"). Instead, the purchase order is more appropriately thought of as an umbrella agreement that governs the terms of future contract offers. See *David Engineering Co*, unpub op at 2. Although the seller is not bound to accept future orders in the same manner as with a requirements contract, the seller is bound by the terms agreed to in the purchase order when future releases are issued and accepted. See *Opdyke Investment Co v Norris Grain Co*, 413 Mich 354, 359; 320 NW2d 836 (1982) ("A contract to make a subsequent contract is not per se unenforceable; in fact, it may be just as valid as any other contract."). These agreements are also known as "release-by-release" contracts. See Killips, *Section 2-201*

5

*Isn't Optional: Option Provisions, Requirements Contracts, and Cadillac Rubber*, 41 Mich Bus L J 46, 47 (2021) (describing release-by-release contracts as structured so that their overarching terms are "only enforceable once a firm quantity is stated," which "happens only when a release is issued" and accepted).[2]

The key difference between a requirements contract and a release-by-release contract rests in the level of mutual obligation between the parties and the risk each party bears. A requirements contract assures the seller that the buyer will be a customer for the length of the contract, but the seller cannot reject future orders for the length of the contract. In contrast, a release-by-release contract "gives both parties the freedom to allow their contractual obligations to expire in short order by either not issuing or not accepting a new release." *Section 2-201 Isn't Optional*, 41 Mich Bus L J at 47; see also *Advanced Plastics Corp*, unpub op at 2-3 (finding that the blanket terms of the contract at issue, which stated that the only firm obligations were in issued and accepted releases, "convincingly demonstrate[] that the parties did not enter into a requirements contract"). The seller cannot

_____

[2] While Michigan caselaw has not previously identified a release-by-release contract as a specific contract type, we adopt the term "release-by-release" to describe a contract with an umbrella agreement that includes general terms but which lacks a quantity term and which operates via releases issued by the buyer to the seller. See Brief for Aisin World Corp of America, Inc., et al. as Amici Curiae (August 4, 2022) (Docket No. 163523) at 11. Although this term might be "new," the concept is not. We have found multiple cases describing these contracts by reference to what they are not—requirements contracts—without naming what they *are* called. See *Advanced Plastics Corp*, unpub op at 2-3 (describing a release-by-release contract and stating that the terms of the contract at issue in that case demonstrated that the parties "did not enter into a requirements contract"); *David Engineering Co, LLC*, unpub op at 2 (describing an agreement by which one contract "sets forth the terms and conditions for all purchase orders . . . [but] is not itself, a purchase order").

be guaranteed future business from the buyer, but the seller can accept or reject any offer for future orders.

## C. FACTS AND PROCEEDINGS OF THIS CASE

The parties in this case are both automotive suppliers and have contracted with one another since at least 2013. Plaintiff, MSSC, Inc., is a Tier-1 automotive supplier and contracts to build assemblies for automobile companies. Tier-1 suppliers take parts provided by Tier-2 suppliers and make assemblies or systems for automobile companies. Defendant, Airboss Flexible Products Co., is a Tier-2 automotive supplier that obtains raw materials from Tier-3 suppliers, makes parts, and supplies the parts to Tier-1 suppliers.

Sometime before July 2013, MSSC contracted with Fiat Chrysler Automobiles (now Stellantis) to build suspension systems for various vehicles. At the outset of their relationship, MSSC supplied Airboss with a purchase order. That purchase order included specific terms and incorporated the general terms and conditions found on MSSC's website by reference. It also included the following language:

> If this Purchase Order is identified as a "blanket" order, this order is valid and binding on seller for the lifetime of the program or until terminated pursuant to MSSC's Terms and Conditions.

The purchase order further stated that "[a]nnual volume is an estimate based on the forecasts of MSSC's customers and cannot be guaranteed." The incorporated terms and conditions stated, in relevant part:

> 2. BLANKET ORDERS: If this order is identified as a "blanket order", [MSSC] shall issue a "Vendor Release and Shipping Schedule" to [Airboss] for specific part revisions, quantities and delivery dates for Products. [MSSC] shall have the right to cancel, adjust or reschedule the quantities of Products shown in such "Vendor Release and Shipping Schedule," except that it may not cancel, adjust or reschedule the Products

7

shown as "Firm Obligations" on such "Vendor Release and Shipping Schedule."

In the normal course of operations, MSSC created a "Vendor Release and Shipping Schedule" pursuant to the terms and conditions and sent it to Airboss. This document included a "firm order"—or an order that could not be changed—as well as longer-term estimates. MSSC was thus obligated to create and send "releases" per the terms and conditions, but neither the purchase order nor the terms and conditions obligated MSSC to send any number of firm orders to Airboss—either as a raw number or as a percentage of MSSC's total need.

Airboss produced the parts for MSSC, and the parties' relationship developed through the releases under the conditions set forth by the purchase order and terms. The requirements, prices, and other terms set out in the blanket purchase order were occasionally modified in a manner that appears to have been mutually beneficial for both parties for roughly six years. Sometime in 2016, for instance, the parties edited the language in the purchase order to include language stating that Airboss "is awarded the . . . value add of MSSC for the life of the . . . program in exchange for continuous improvement and year over year productivity." In mid-2019, however, Airboss began to experience losses on 6 of the 42 parts it produced for MSSC. Eventually, according to Airboss, these annualized losses totaled over $1 million. As a result, Airboss sought to pass the price increases onto MSSC. MSSC agreed to a price increase on the condition that Airboss enter into a letter agreement barring further unilateral price increases for the lifetime of the program. Although Airboss agreed, Airboss later alleged that it continued

to lose money and sent a letter to MSSC in December 2019, stating that it would cease taking further orders from MSSC starting in March 2020.

MSSC, in response, sued Airboss for anticipatory breach of contract and sought specific performance on the contract as written. The Oakland Circuit Court granted a preliminary injunction in favor of MSSC, finding that the contract was a requirements contract and was likely enforceable. Subsequently, Airboss moved for summary disposition, arguing that the purchase order failed to satisfy the statute of frauds and that it showed no mutuality of obligation because it did not require MSSC to purchase any quantity of parts from Airboss but instead obligated Airboss to supply any quantity MSSC requested.[3] MSSC also moved for summary disposition, arguing that Airboss was bound to provide parts for the life of the program. The trial court granted MSSC's motion for summary disposition. In its order and opinion, the trial court found that the purchase order contained a "quantity term," as required by the statute of frauds, because the purchase order was identified as a "blanket" purchase order. In other words, the trial court interpreted the term "blanket" to be a quantity term. Further, the trial court examined the past dealings between the parties and found that their interactions indicated an intent to enter into a requirements contract. Finally, the trial court rejected Airboss's argument that the agreement failed for lack of mutuality of obligation, specifically noting that requirements contracts do not fail on that basis alone given that a buyer must operate in good faith and abide by commercial standards of fair dealing.

---

[3] Airboss moved for summary disposition under MCR 2.116(C)(7) ("[D]ismissal of the action . . . is appropriate because of . . . [the] statute of frauds . . . .") and MCR 2.116(C)(10) ("[T]here is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law.").

9

The Court of Appeals affirmed in a published per curiam decision. It held that "the use of 'blanket order' in this case was intended as an imprecise quantity term," *MSSC, Inc v Airboss Flexible Prod Co*, 338 Mich App 187, 195; 979 NW2d 718 (2021), and that the use of that term was sufficient to create a requirements contract that satisfied the statute of frauds. The Court of Appeals went on to hold that the purchase order "did not state a specific quantity because plaintiff's need for parts was dependent on its customer's production schedule, which is common in the automotive industry." *Id*. It also affirmed the trial court's holding that the contract did not fail for lack of mutuality of obligation. *Id*. at 196. Airboss sought leave to appeal in the Supreme Court. We granted the application and asked the parties to address "whether the purchase order between the parties, together with the relevant written terms and conditions, satisfied the requirements of the Uniform Commercial Code's statute of frauds, MCL 440.2201(1)." *MSSC, Inc v Airboss Flexible Prod Co*, 508 Mich 1024, 1024 (2022). As set forth below, we find that they did not.

## II. STANDARD OF REVIEW

This Court reviews grants of summary disposition de novo. See *DeRuiter v Byron Twp*, 505 Mich 130, 139; 949 NW2d 91 (2020). This case also involves questions of statutory and contractual interpretation, which we likewise review de novo. See *id*.; *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422, 426; 670 NW2d 651 (2003). When we review an issue de novo, we "review this issue independently, with no required deference to the courts below." *In re Ferranti*, 504 Mich 1, 14; 934 NW2d 610 (2019).

10

III. ANALYSIS

We find that the documents between the parties created a release-by-release contract, not a requirements contract. Significantly, the writings between MSSC and Airboss did not contain a quantity term. Rather, the purchase order in this case only stated that MSSC would issue releases; it made no reference anywhere to a quantity term. While the releases contained a firm quantity and MSSC's estimated future need, those releases only constituted an obligation binding Airboss as to each individual release if Airboss accepted—not a promise to fulfill all future releases. In other words, because the purchase order contained no quantity term, as is required to be an enforceable contract for the sale of goods under the UCC, Airboss was free to provide MSSC with notice that it would no longer accept future releases. We therefore reverse the Court of Appeals decision and, as discussed more fully later in this opinion, overturn *Great Northern Packaging, Inc v Gen Tire & Rubber Co*, 154 Mich App 777; 399 NW2d 408 (1986), to the extent that it contradicts this opinion.

A. OUTPUT AND REQUIREMENTS CONTRACT CASELAW

There are only a few Michigan cases that have discussed output and requirements contracts that are relevant to this case. In *In re Frost Estate*, 130 Mich App at 558, the Court of Appeals analyzed an output contract that provided for the sale of " 'all wood sawable.' " The total quantity of wood at issue was ambiguous because the contract failed to identify which parcel of land the agreement covered. *Id*. at 561. However, the quantity *term—"all"*—was specific. The Court of Appeals held that the term "all" "referred to a quantity and was sufficient to meet the requirements" of the statute of frauds and that parol

11

evidence was admissible to determine the relevant parcel or parcels the agreement covered. *Id*. at 565.

The same concept applies to requirements contracts. See MCL 440.2306(1) (defining output and requirements contracts); see also *Lorenz Supply Co*, 419 Mich at 616 (providing that "the quantity term . . . alone must be specified in writing" in a requirements contract). A requirements contract can be nonspecific as to the quantity, but it must still have a quantity term that can be evaluated further using parol evidence.

This Court evaluated an alleged requirements contract in *Lorenz Supply Co*, 419 Mich 610. In that case, Lorenz Supply Company and American Standard, Inc., entered into an oral distributorship agreement whereby American Standard agreed to provide Lorenz with $420,000 in "out of the wall" plumbing materials (e.g., wash basins and faucets). *Id*. at 613 n 1; *id*. at 618 (BRICKLEY, J., concurring). The only writing that referred to the existence of a distributorship agreement was a letter welcoming Lorenz to " 'the family of American Standard distributors . . . .' " *Id*. at 623 (BRICKLEY, J., concurring). After a breakdown between the parties, Lorenz sued American Standard for breach of the oral distributorship agreement. American Standard argued that the distributorship was actually a sale-of-goods contract governed by the UCC and therefore was unenforceable for lack of a written quantity term. We held that the distributorship agreement did not constitute a sale of goods and, thus, the UCC did not apply. As a result, the oral agreement was enforceable. *Id*. at 615 (opinion of the Court). Of significance to this case, we noted in *Lorenz* that the quantity term in a UCC contract may not be inferred but "must, . . . under § 2-201, be specifically stated." *Id*. at 614-615.

12

Just two years after *Lorenz* was decided, the notion of what constitutes "quantity" under the UCC's statute of frauds became muddled. In *Great Northern Packaging*, 154 Mich App at 779, the seller, Great Northern Packaging, Inc., sold a packaging system to General Tire and Rubber Company, which, in turn, used the system to ship products to Ford Motor Company. General Tire issued a "change order" (equivalent to the purchase orders at issue here) that modified the quantity heading from 50 units to a "blanket order" with no expiration date. *Id*. at 780. After a Great Northern employee started working for a competitor, General Tire began ordering from both companies; eventually, General Tire ordered more units from the competing company. Great Northern sued to enforce the agreement, claiming that the term "blanket order" required General Tire to purchase all its packaging systems from Great Northern. In response, General Tire argued that the contract was void under the statute of frauds because "blanket" was not a quantity term. *Id*. at 786. The Court of Appeals found for Great Northern, holding that "the term 'blanket order' expresses a quantity term, albeit an imprecise one," analogous to the " 'all wood sawable' " quantity term in *In re Frost Estate*. *Great Northern Packaging*, 154 Mich App at 787, quoting *In re Frost Estate*, 130 Mich App at 558, 560. But the Court of Appeals failed to recognize that although the *total quantity* might be imprecise in a requirements contract (as in *In re Frost Estate*), the *quantity term* must be provided in the writing and cannot be provided via parol evidence.

For example, a produce market owner could agree with Orchard X that "as a blanket policy, I will buy all my apples from Orchard X for $3.00/bushel." While we don't know the specific number or total quantity of bushels that the market owner will purchase, we know that 100% of the apples the market owner purchases will come from Orchard X.

13

How do we know this? Because the market owner stated that they would purchase "all my apples" from Orchard X. Accordingly, "all my apples" constitutes the required quantity term in this example. The fact that there is a "blanket policy" is not the provision that informs the quantity term.

Alternatively, if the market owner says to Orchard X that "as a blanket policy, I will only purchase apples for $3.00/bushel," we are left to question both what percentage of apples sold at the market will come from Orchard X and how many bushels of apples the market will purchase. There is a difference between a quantity term ("all my apples") and a precise quantity (a specific number of bushels). They are not synonymous. A contract may leave the final or total quantity ambiguous or unspecified in a requirements contract, but it may not state an imprecise quantity term. As a result, to the extent that *Great Northern* stands for the conclusion that the term "blanket order" alone infers a quantity term in an alleged UCC sale-of-goods contract, it is overruled.

Finally, the trial court in this case relied heavily upon *Cadillac Rubber & Plastics, Inc v Tubular Metal Sys, LLC*, 331 Mich App 416; 952 NW2d 576 (2020), when it ruled in favor of MSSC. That case also involved a Tier-1 automotive supplier (Tubular Metal Systems, LLC) and a Tier-2 supplier (Cadillac Rubber & Plastics, Inc., doing business as Avon Automotive). Tubular Metal issued two purchase orders that incorporated general terms and conditions and provided that "MATERIAL REQUIREMENT WILL BE RELEASED WEEKLY." Additionally, Tubular Metal's terms and conditions "provided for the issuance of material authorization releases under which [Tubular Metal] was obligated to purchase from [Cadillac Rubber] a quantity between one part and 100% of [Tubular Metal's] requirements." *Id*. at 429-430. Cadillac Rubber argued that all

14

requirements contracts *must* be exclusive—i.e., that Tubular Metal could only use Cadillac Rubber as its supplier. The Court of Appeals disagreed and determined that the agreement was a nonexclusive requirements contract. *Id*. at 430 & n 6. The Court of Appeals also found that the parties had, for eight years, behaved in a manner that suggested an intent to create a requirements contract and that there was no evidence that Tubular Metal failed to act in good faith. *Id*. at 430-431.

## B. DOCUMENTS DID NOT CREATE A REQUIREMENTS CONTRACT

As an initial matter, we agree with the Court of Appeals in *Cadillac Rubber* that requirements contracts do not always have to be exclusive. A seller can agree to provide a nonexclusive part of the buyer's total need. But the trial court in this matter relied on *Cadillac Rubber* to find that the use of a blanket purchase order combined with a substantial history of prior dealings between the parties created a requirements contract that bound Airboss. This was erroneous because in *Cadillac Rubber*, the Court found the existence of a quantity term—"a quantity between one part and 100%"—which therefore allowed it to use evidence of past practice (or parol evidence) to discern the parties' intent.[4] *Id*. at 430-431.

---

[4] Airboss has urged us to overrule the holding in *Cadillac Rubber* that the purchase order's language providing for "a quantity between one part and 100%" constituted a proper quantity term for a nonexclusive contract under MCL 440.2201(1), thus allowing for the use of parol evidence to determine the parties' intent as to the existence of a requirements contract. Airboss urges us instead to adopt the position taken in *Acemco*, unpub op at 5, which held that a requirements contract cannot grant "complete discretion" to the buyer because " '[a]ny' quantity is in fact no quantity at all." We decline to address this apparent inconsistency today because, in this case, there was no quantity term set forth in the purchase order or in any other document. Whether *Cadillac Rubber* and *Acemco* can be reconciled and, if not, which is correct remain questions for another day.

Here, the documents between MSSC and Airboss do not contain such a quantity term. The terms of the agreement, as stated in the purchase order and the terms and conditions, set blanket policies governing the sale of parts between MSSC and Airboss. These terms did not create any obligation for MSSC to purchase any parts from Airboss. The purchase order and terms and conditions leave both the quantity term and total quantity undefined, which violates the UCC's statute of frauds. While the terms state that MSSC "shall issue" releases, there is no obligation for those releases to represent a share of MSSC's total needs. MSSC could issue release after release stating "zero" in the firm-obligations category while contracting with another Tier-2 supplier for 100% of its production without running afoul of the purchase order or the terms and conditions. This, by definition, is not a requirements contract. The lower courts found that the purchase order's "blanket order" language and the statement that "[a]nnual volume is an estimate based on the forecasts of MSSC's customers and cannot be guaranteed" evidenced a quantity term. But those provisions do not, in fact, state a quantity term. Rather, they are silent.

Whether exclusive or not, a quantity term must be stated in a UCC sale-of-goods contract. And although parol evidence can be used to determine the specific total of an imprecise quantity in a requirements or output contract under the UCC, it cannot be used to determine the existence of the quantity term itself. See *In re Frost Estate*, 130 Mich App at 558-559. By creating a quantity term when there was none—just as the Court in *Great Northern* did—and then relying upon past practice between the parties, the lower courts here committed reversible error.

16

MSSC next argues that the contractual requirement of "good faith and fair dealing" creates a requirements contract even if the quantity term is missing. According to MSSC, this is because "the party who will determine the quantity . . . is obligated to operate in good faith and according to commercial standards of fair dealing to ensure that the requirements ordered will approximate a reasonably foreseeable figure." Plaintiff's Brief on Appeal (May 2, 2022) at 32, quoting *Cadillac Rubber*, 331 Mich App at 426, in turn quoting MCL 440.2306, comment 2 (quotation marks omitted). Thus, because Airboss does not argue that MSSC acted outside the bounds of good faith or fair dealing, MSSC claims that Airboss is bound to supply 100% of MSSC's requirements at the negotiated price. We find this unpersuasive. Every contract has an implied duty of good faith and fair dealing. But the quantity term must be explicit under MCL 440.2201(1), and an implied duty is very different from an explicit written requirement. Holding to the contrary would mean that every contract without an explicit quantity term meets the requirements of the statute of frauds because all contracts require good faith and fair dealing. If this were a requirements contract, the duty of good faith and fair dealing *would* require both MSSC and Airboss to act in good faith while fulfilling their respective obligations. However, good faith alone cannot solve the problem of the missing quantity term. The terms of this agreement allow MSSC to simply contract with another Tier-2 supplier to provide the parts at a cheaper rate[5] without acting in bad faith or engaging in unfair dealing. This would not violate the parties' implied duties because the purchase order does not

---

[5] MSSC, in briefing and during oral argument, discussed the difficulty of finding another Tier-2 supplier that had been approved by Stellantis. Although that is a practical concern that this Court does not ignore, it does not change the reality of what a contract permits or does not permit.

17

require that *any* business be directed to Airboss. In short, the "good faith and fair dealing" requirement applies to all contracts—it does not create a requirements contract.

Finally, MSSC points to a 2015 communication between the parties that stated that Airboss "is awarded the . . . value add of MSSC for the life of the . . . program in exchange for continuous improvement and year over year productivity." MSSC claims that this language created a requirements contract.[6] Again, we find this argument unpersuasive. In context, "value add" is more appropriately read as a statement of pricing—and Airboss sharing in profitability of the parts it makes—not actual sourcing. An award of the "value add" in exchange for "continuous improvement and year over year productivity" shows an expectation of decreasing costs-per-unit leading to greater reward to the manufacturer (Airboss). It is more appropriately read as a per-unit dollar figure shared with Airboss, not an obligation for MSSC to purchase parts from Airboss.[7]

---

[6] There is a dispute between the parties as to whether the parts discussed in this addendum are the same parts at issue in this case. Given our holding today that the parties did not enter into a requirements contract, we need not decide this matter.

[7] While the partial concurrence would remand this case to the trial court to determine whether the e-mail communications constituted an agreement, we find that to be unnecessary. Airboss's initial motion for summary disposition included a motion under MCR 2.116(C)(10), which tests the factual sufficiency of a claim. The partial concurrence is correct that the lower courts failed to address this issue despite full discovery and full briefing on the matter. Whether a contract exists is a question of law that—had the lower courts decided it—we would review de novo. *Bandit Indus, Inc v Hobbs Int'l, Inc (After Remand)*, 463 Mich 504, 511; 620 NW2d 531 (2001). This Court has the full record before it, including the relevant e-mails, following extensive discovery. As a result, we disagree with our partially concurring colleague that we are not in a position to review the disputed e-mails and assess their impact upon the existence—or nonexistence—of a legal contract.

18

In summary, none of the documents between MSSC and Airboss created any obligation for MSSC to purchase from Airboss. Without such obligation, there is no requirements contract. It is a release-by-release agreement.

## C. THE PARTIES ENTERED INTO A RELEASE-BY-RELEASE CONTRACT

Given our holding that the documents in this case lacked a quantity term and did not create a requirements contract under the UCC, we hold that the parties entered into a release-by-release agreement. The purchase order and incorporated terms and conditions created a blanket—or umbrella—agreement, while the releases created individual purchasing contracts governed by the umbrella terms. This saved the parties from renegotiating complex terms for each order while allowing the parties greater flexibility than a requirements contract would allow. Either party was able to walk away from the agreement once a release was fulfilled, and Airboss's choice to do so is not legally actionable. Parties are free to balance the competing forces of flexibility and certainty. MSSC and Airboss chose greater flexibility at the expense of certainty.

## IV. CONCLUSION

In conclusion, the purchase order, terms and conditions, and other writings between MSSC and Airboss lacked a quantity term. No document reflected a number or portion of parts that MSSC committed to purchase from Airboss on an ongoing basis. The term "blanket" is not a quantity term, and we overrule *Great Northern Packaging*, 154 Mich App 777, to the extent that it conflicts with that holding. Given the lack of a quantity term, the agreement between MSSC and Airboss did not comply with the UCC's statute-of-frauds provision set forth in MCL 440.2201(1), and it was error for the lower courts to use

19

parol evidence to determine the intent of the parties. Without a quantity term, the parties could not have entered into a requirements contract under MCL 440.2306(1). Instead, we hold that the parties entered into a release-by-release contract. We reverse the Court of Appeals opinion and remand this case to the Court of Appeals for further proceedings that are consistent with this opinion.

Elizabeth M. Welch
Elizabeth T. Clement
Richard H. Bernstein
Megan K. Cavanagh

STATE OF MICHIGAN

SUPREME COURT

MSSC, INC.,

       Plaintiff/Counterdefendant-
       Appellee,

v                                   No. 163523

AIRBOSS FLEXIBLE PRODUCTS CO.,

       Defendant/Counterplaintiff-
       Appellant.

_____

VIVIANO, J. (*concurring in part and dissenting in part*).

At issue is whether an enforceable contract exists between plaintiff, MSSC, Inc., and defendant, Airboss Flexible Products Co. The answer to this question turns on whether the agreement between the parties contains a quantity term such that it satisfies MCL 440.2201(1), the statute of frauds of the Uniform Commercial Code, MCL 440.1101 *et seq*. I agree with the majority that the term "blanket" order, without more, does not express a quantity term and that *Great Northern Packaging, Inc v Gen Tire & Rubber Co*, 154 Mich App 777; 399 NW2d 408 (1986), should be overruled to the extent that it held to the contrary. I also agree that several of MSSC's theories for why a valid requirements contract exists are without merit. However, portions of the majority's opinion are unnecessarily broad and lack supporting authority. Rather than hold that the parties did not enter into a valid requirements contract, I would remand this case to the trial court for it to resolve this issue.

## I. THE TERM "BLANKET" ORDER IS NOT A QUANTITY TERM

I agree with the majority's conclusion that the term "blanket" order is not a quantity term sufficient to satisfy the UCC's statute of frauds provision in MCL 440.2201(1). MSSC argues that the term "blanket" order is a quantity term that is consistent with a requirements contract. To create a requirements contract, the agreement must include "[a] term which measures the quantity by . . . the requirements of the buyer . . . ." MCL 440.2306(1); see also *Methodist Health Servs Corp v OSF Healthcare Sys*, 859 F3d 408, 410 (CA 7, 2017) (explaining that a requirements contract "obligate[s] [the] buyer to purchase all, or a substantial portion of, its requirements of specific goods or services from one supplier"); 2A Anderson, UCC (3d ed, December 2022 update), § 2-306:28 ("A requirements contract obligates the buyer to purchase all the goods that the buyer will need for a particular use contemplated by the parties."). The trial court in this case held that, like in *Great Northern*, the term "blanket" order in the parties' contract expresses a quantity term, and the Court of Appeals agreed. See *Great Northern*, 154 Mich App at 787 (holding that "blanket order" is a quantity term, "albeit an imprecise one," and that parol evidence can be used to clarify what quantity was intended).

But the term "blanket" order, on its own, cannot be a quantity term because it is silent as to any quantity of parts that MSSC was required to purchase from Airboss. See *Royal Paper Box Co v E R Apt Shoe Co*, 290 Mass 207, 209-210; 195 NE 96 (1935) (determining that the "dominant words" in the contract at issue were "Requirements for Balance of year to Jan 1 1930," not the estimates that followed, and that "[t]he words 'Blanket Order' in the column headed 'Quantity' lend further support to this construction"). As the majority recognizes, if a contract states an imprecise quantity, parol evidence is

admissible to "explain[] or supplement[]" the agreement, but parol evidence may not be admitted to add a quantity term to a contract in which no quantity term exists. *In re Frost Estate*, 130 Mich App 556, 559-560; 344 NW2d 331 (1983). Thus, I agree with the majority that the lower courts in this case made the same mistake that the Court of Appeals made in *Great Northern* by reading "blanket" order as creating a quantity term where none existed.[1]

## II. WHETHER THE PARTIES NONETHELESS ENTERED INTO A VALID REQUIREMENTS CONTRACT

That "blanket" order, on its own, is not a quantity term does not end the inquiry. Whether a quantity term was stated elsewhere in the agreement hinges on whether the parties entered into a requirements contract. A requirements contract existed here if MSSC was obligated to purchase parts from Airboss.[2]

---

[1] This does not mean that a blanket order is necessarily inconsistent with a requirements contract. A purchase order between two parties with a valid requirements contract may be a "blanket" order, but there would need to be some other provision in the contract indicating that the buyer is required to purchase all or a portion of its requirements from the seller to satisfy the quantity term. See *Methodist Health Servs*, 859 F3d at 410; MCL 440.2306(1).

[2] I agree with the majority that a requirements contract can exist even when there is not 100% exclusivity for the buyer's needs as long as there is a meeting of the minds that the buyer is required to purchase some portion of its needs from the seller. See *Cadillac Rubber & Plastics, Inc v Tubular Metal Sys, LLC*, 331 Mich App 416, 426-427; 952 NW2d 576 (2020); *id*. at 433-434 (SHAPIRO, J., concurring in part and dissenting in part); see also 2A Anderson, UCC (3d ed, December 2022 update), § 2-306:31 ("A requirements contract does not necessitate that the buyer purchase 'all' of the buyer's requirements of the goods from the seller."). I take no position as to whether the majority in *Cadillac Rubber* was correct to hold that "between one part and 100% of Tubular's requirements" was a proper quantity term for a requirements contract. *Cadillac Rubber*, 331 Mich App at 430 (opinion of the Court).

Relying on *Cadillac Rubber & Plastics, Inc v Tubular Metal Sys, LLC*, 331 Mich App 416; 952 NW2d 576 (2020), the trial court in this case looked at the use of a "blanket" purchase order and the conduct of the parties to conclude that a valid requirements contract existed. But the trial court's reliance on *Cadillac Rubber* was misplaced because the Court of Appeals in *Cadillac Rubber* had first analyzed the language of the contract and concluded that a valid requirements contract existed before looking to parol evidence. *Cadillac Rubber*, 331 Mich App at 430-431. The trial court here erred by using parol evidence—the "course of conduct" of the parties—to create a quantity term where none existed. See *In re Frost Estate*, 130 Mich App at 559-560.[3]

In addition to the "blanket" order language in the purchase order, MSSC raises three other arguments in an attempt to demonstrate that the parties had a valid requirements contract. First, MSSC points to the provision in the purchase order stating that MSSC "shall issue" releases as evidence that it was obligated to purchase its required parts from Airboss. I agree with the majority that this provision does not establish a requirements contract because it did not obligate MSSC to issue releases representing all or even a share of its needs. See *Methodist Health Servs*, 859 F3d at 410; 2A Anderson, UCC (3d ed, December 2022 update), § 2-306:31.

---

[3] Under the UCC, courts may consider the parties' "course of performance" when interpreting the language of a contract. MCL 440.1303(4) ("A course of performance or course of dealing between the parties or usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware is relevant in ascertaining the meaning of the parties' agreement [and] may give particular meaning to specific terms of the agreement . . . ."). "[T]he express terms of an agreement and any applicable course of performance, course of dealing, or usage of trade must be construed whenever reasonable as consistent with each other." MCL 440.1303(5). However, parol evidence alone cannot establish a quantity term under the statute of frauds.

Second, MSSC argues that "the covenant of good faith and fair dealing" obligated MSSC to buy parts from Airboss such that it created a requirements contract. I agree with the majority that MSSC's argument is unpersuasive. At issue here is a contract subject to the UCC, and every contract under the UCC "imposes an obligation of good faith in its performance and enforcement." MCL 440.1304. A quantity term must be "shown in the writing," MCL 440.2201(1), but this "good faith" obligation is found in the statute, not the purchase order. Therefore, MSSC's argument fails.

Finally, MSSC points to the following update to the purchase order in May 2015 as evidence of a valid requirements contract:

> The following 2016 WK/WD part numbers will be added to the blanket as line items when the parts are PPAPed approved. AirBoss Flexible Products is awarded the bushing/bonding/assembly value add of MSSC for the life of the 2016/2017 generation of the WK74 and WD75 program in exchange for continuous improvement and year over year productivity. (Program life could go into 2018-2019 for this generation)

Although MSSC relied on this provision in the lower courts, the lower courts did not address it in their decisions. It is unclear to me whether this provision obligated MSSC to purchase a quantity of parts from Airboss such that the statute of frauds is satisfied. The majority cursorily states that this provision deals with pricing and reflects an expectation of decreasing costs per unit. But the majority does not explain how it reached this conclusion, and how it did so is unclear to me. Additionally, as the majority acknowledges, the parties dispute whether the parts discussed in this update are the same parts as those at issue in this case. For these reasons, rather than attempting to answer a question that neither lower court addressed, I would remand this case to the trial court for it to determine whether

5

this provision obligated MSSC to purchase a quantity of parts from Airboss such that the statute of frauds is satisfied.[4]

### III.  CONCLUSION

In conclusion, I believe that a question remains as to whether the agreement between the parties contains a valid quantity term.  I agree with the majority that the term "blanket" order, without more, is not a quantity term, that *Great Northern* should be overruled to the extent it held to the contrary, and that the lower courts erred by using parol evidence to create a quantity term as opposed to merely resolving an ambiguity as to the quantity term.  I also agree that neither the provision in the purchase order stating that MSSC "shall issue" releases to Airboss nor the UCC's imposition of "an obligation of good faith" created a requirements contract such that the statute of frauds is satisfied.  But I believe that there remains a legitimate question as to whether the May 2015 update to the purchase order obligated MSSC to purchase a quantity of its requirements from Airboss.  I would remand this case to the trial court for it to address that issue.

David F. Viviano
Brian K. Zahra

BOLDEN, J., did not participate in the disposition of this case because the Court considered it before she assumed office.

---

[4] On remand, the trial court would also have the opportunity to determine whether any other provisions of the purchase orders support Airboss's argument that a requirements contract was formed, including a provision in one of the purchase orders stating that the order was a "binding" agreement that lasted "for the lifetime of the program . . . ."